**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| **600 MARSHALL ENTERTAINMENT** ) | |
| **CONCEPTS, LLC d/b/a, THE SPOT,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | CASE NO. 2:05-cv-02865 |
| ) | |
| **THE CITY OF MEMPHIS,** ) | |
| ) | |
| Respondent, ) | |
| ) | |
| and ) | |
| ) | |
| **MEMPHIS MEDICAL CENTER**, ) | |
| **a Division of the Memphis Bio-Works** ) | |
| **Foundations**, ) | |
| ) | |
| Intervenor. ) | |
| ) | |

---

**MEMORANDUM OPINION, ORDER, AND JUDGMENT**

---

**I.      INTRODUCTION**

Petitioner 600 Marshall Entertainment Concepts, LLC, doing business as The Spot, petitions

this Court for a Writ of Certiorari and Supersedeas, declaratory relief, and injunctive relief against

Respondent City of Memphis (the City).[1]  Petitioner alleges that the City violated its constitutional

and civil rights by wrongfully revoking Petitioner's compensated dance permit (CDP).  The Court

conducted a non-jury trial on June 9-10, 2008 on the merits of this case.  After considering the

---

[1]At trial, Petitioner represented that it was no longer bringing a claim for loss of business
and/or profits.

1

testimony of the witnesses, exhibits,[2] and briefs of the parties, the Court makes the following

findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

## A.    THE CENTRAL BUSINESS DISTRICT

Petitioner is located at 598, 600 and 616 Marshall and 631 Madison (600 Marshall),

Memphis, Tennessee within  the zoning district known as the Central Business District (CBD).

(Exs. 1, K.)  The CBD was created, effective in 1981, by City ordinance.  Adult entertainment[3] was

permitted in the CBD, provided that a Certificate of Occupancy, also known as a Use and

Occupancy permit (U & O), from the Memphis and Shelby County Office of Construction Code

Enforcement (Office of Code Enforcement), a Special Use Permit,[4] and other required permits were

maintained by the facility.  (Ex. 15.)  A facility's U & O designation was determined by its

predominant use.  In 1993, the City and Shelby County issued Joint Ordinance No. 4209 (the 1993

Ordinance), which deleted the provision of adult entertainment as one of the permitted uses of the

CBD.  Subsequent to 1993, adult entertainment has not been permitted in the CBD pursuant to City

and Shelby County ordinance.

---

[2]The exhibits admitted at the December 16, 2005 preliminary injunction hearing were, by consent, also admitted in this trial.  Despite a diligent search, the Court has been unable to locate the exhibits.  However, the Court was able to review the exhibits at the earlier hearing and based on that review, has appropriately considered them in the context of the trial.

[3]"Adult entertainment" is defined by the City's zoning regulations as including: adult book/video stores, adult motion picture theaters, adult mini-motion-picture theaters, live performances, and adult novelty stores that have "specified anatomical areas" or "specified sexual activities" depicted, described, or displayed.  (Ex. C.)

[4]The Special Use Permit requirement was later found unconstitutional and no longer required as of October 1992.  (Ex. D.)

B.      **PRIOR HISTORY OF 600 MARSHALL**

600 Marshall has been operated as a bar, club, or other similar facility by various entities since at least the 1970's.  From the 1970's until the early 1990's, the location continuously and regularly featured what patrons and employees considered adult entertainment including: male dancers dancing with erections, male strippers, women dancing, adult films, drag shows, and/or shows with simulated sex acts.  (Exs. 9-12, 14; Prelim. Inj. Hr'g Tr. 102-04, Dec. 16, 2005.)  The dancers danced for compensation.  (Exs. 9-12.)  The police were aware of the activities occurring at 600 Marshall.  (Exs. 11-14.)

Beginning in 1993 or 1994, Nathan Rosengarten (Rosengarten) worked at 600 Marshall and subsequently ran the facility beginning in 1996 or 1997.  After the club was closed for approximately two to three months, Rosengarten assumed the lease of the club in February 2000 and began renting the facility out for different events.  Rosengarten testified that it was not his intention to operate an adult entertainment facility nor to encourage inappropriate behavior.  Further, his annual Applications for Public Dance Hall Permit never indicated that the facility would feature adult entertainment or that it would feature dancers receiving compensation.[5]   (Exs. F-I.)  Rosengarten also indicated this on insurance applications for 600 Marshall.

There is some inconsistency between Rosengarten's prior testimony and his testimony at trial as to the nature of the entertainment at 600 Marshall while he was associated with the club.  Rosengarten testified in his affidavit and during the preliminary injunction hearing that at varying

---

[5]The Application for Public Dance Hall Permit asks applicants whether the establishment will provide adult entertainment and if so, to describe the type of entertainment that will be provided to customers.  (E.g., Ex. 1.)  Further, the application also asks whether the establishment would have dancers accepting compensation directly or indirectly for dancing. (E.g. Ex. 1.)

intervals, the club had adult films, fetish parties, gothic parties, male strippers, and/or other dancers who would expose themselves. (Ex. 13; Prelim. Inj. Hr'g Tr. 83-85, 90-92.) Unlike the practice of earlier clubs at 600 Marshall, many of these performers were not compensated for dancing. (Ex. 13.) In addition, many of these acts were not dance performances. (Id.) This use continued and did not terminate until July 2005. (Id.)

However during the trial, Rosengarten testified that although there were gothic parties at regular intervals, he ended them in March or April of 2005 when they became too "crazy." Rosengarten also stated that to his knowledge, there were no strippers or adult films presented at the club. Although there were fetish parties during the late 1980's, the last one occurred before he took over the club. Further, during a rental where patrons exposed themselves, Rosengarten stopped the conduct.

Jason Kamp (Kamp), a patron who frequented the club at 600 Marshall from 1998-2005 approximately three to four times per year, testified that in addition to DJ's and dancing, there were wet T-shirt contests, women who would expose themselves or simulate sexual acts, and rave parties in the basement. Kamp was unsure whether the individuals engaging in these activities were employees or merely patrons of the club. Bryant Tucker (Tucker), a patron from 2002-2003, would go to 600 Marshall approximately every other Thursday. Similarly, he testified that there were club-sponsored wet T-shirt contests, female patrons who would expose themselves by removing their shirts, and rave parties in the basement. However, Tucker testified that it was not tolerated if male patrons exposed their penis to female patrons.

Although adult entertainment apparently occurred at 600 Marshall for many years, the Office of Code Enforcement between 1980 and December 2005 never issued a U & O for adult

4

entertainment for the location. (Ex. 15.) However, Allen Medlock (Medlock), a zoning official with the Office of Code Enforcement, testified that the City only recently began to separately designate adult entertainment nightclubs as "AEN." Previously, the City issued permits for such venues with a variety of designations including "nightclub" and "restaurant." 600 Marshall was usually coded as a nightclub. A Special Use Permit was also never issued between 1981 and 1993 for 600 Marshall. In addition, despite the past presence of compensated dancers, the City's Permits and Licensing Department never issued a CDP for the location.[6] (Ex. 17.)

## C. PETITIONER'S APPLICATION FOR A COMPENSATED DANCE PERMIT

On August 15, 2005 Petitioner, through Charles G. Westlund (Westlund), entered into an Agreement for Purchase and Sale of Assets and Sales Contract for 600 Marshall. (Ex. 1.) Westlund, sole member of Petitioner and the owner of several other nightclubs, purchased the property with the intention of operating an adult nightclub. Westlund testified that prior to the purchase, he conducted a due diligence investigation that included speaking with Lilli Jackson (Jackson), the City's Permits/License Manager, who told him he could get the required permits to operate an adult entertainment venue. He also spoke with previous owners, operators, employees, and others who knew of the past activities at 600 Marshall. Shortly thereafter, Westlund began renovations to the property.

Also on August 15, 2005, Westlund, on behalf of Petitioner, applied for a Beer Permit with the Licensing Commission of the City. (Ex. 1.) An applicant, after fulfilling several other requirements, must appear before the Alcohol Commission at the Commission's next scheduled

---

[6]A CDP, as opposed to a dance hall permit, is required of any facility that wishes to both sell beer and feature dancing performers who are compensated either directly by management of the facility or indirectly by patrons.

meeting. (Ex. 8.) The Alcohol Commission meets two times per month. (Id.) Petitioner's Application for Beer Permit was initially denied on September 7, 2005.[7] (Ex. 1.)

Westlund applied for a CDP through the City's Permits and Licensing Department on August 15, 2005 as well. (Id.) On its Application for Public Dance Hall Permit, Petitioner indicated both that it would likely feature adult entertainment and that it would feature dancers receiving compensation. (Id.) On September 16, 2005, Petitioner was issued the permit pursuant to its application. (Ex. 2.) Petitioner then applied for a U & O on September 22, 2005. (Ex. 7.) On September 26, 2005, Jackson informed Petitioner by letter that it was reviewing whether its CDP permit was granted in error. (Ex. 3.) Jackson testified that she had concerns about Petitioner's location and consulted with City attorneys and zoning officials. On October 4, 2005, Jackson sent Petitioner a letter revoking the permit. (Ex. 4.) The reason given for the revocation was that upon further review, the City had determined that Petitioner was within the Central Business Improvement District (CBID)[8] and therefore ineligible for a CDP. (Id.) Because the letter did not contain a provision staying the revocation, Petitioner's CDP was null and void as of that time. Westlund testified that as a result of the revocation, he believed that he could not operate an adult entertainment nightclub, or even a non-adult entertainment nightclub with clothed, compensated dancers.

During her testimony, Jackson appeared to assume that issuance of a CDP meant the facility was providing what she considered adult entertainment, i.e., a strip club or similar venue. Jackson

---

[7]The City later granted Petitioner a Beer Permit. (Pet'r's Pretrial Mem. 2.)

[8]The CBID is a tax overlay district that geographically coincides with the CBD zoning district.

also testified that she did not receive training as to the City ordinance governing the issuance of dance hall permits or CDP's and the City did not issue any additional documents, instructions, or directives regarding administration of the ordinance. Similarly, the City did not supply any documents, instructions, or directives that instructed applicants on how to properly fill out the Application for Public Dance Hall Permit.

Petitioner availed itself of the City's administrative channels to seek review of the denial/revocation of the CDP. On November 2, 2005, a panel designated by Larry Godwin (Godwin), Director of Police Services, heard Petitioner's appeal and ultimately found that the permit was "wrongfully revoked and that the permit should be reissued immediately conditioned on prohibition of any adult entertainment or activity . . . unless and until the Petitioner receives the proper approvals from the Building Official." (Ex. 5.) Dedrick Brittenum (Brittenum), a member of the panel, testified that the reason for the panel's decision was that the issuance of a CDP is unrelated to the presence of adult entertainment.

However, on December 15, 2005, Godwin rejected the panel's findings and recommendations. (Id.) Godwin testified that he was unfamiliar with the CDP scheme. In addition, Godwin assumed that the purpose of the panel was to determine why the permit was issued in error and did not believe that the panel could recommend re-issuance of the permit. Godwin was not present at the hearing and did not review the transcript or evidence from the hearing. Petitioner instituted this action on November 17, 2005, subsequent to the panel hearing, but prior to Godwin's ultimate decision on the appeal. Westlund ultimately received a CDP with restrictions as to nudity and a U & O as the result of a negotiated settlement.

**III. CONCLUSIONS OF LAW**

At issue is whether Petitioner is entitled to use 600 Marshall for the provision of adult entertainment, such that a suppression of that entitlement would constitute a violation of its constitutional and civil rights. The refusal or revocation of a CDP is subject to judicial review. Memphis, Tenn., Ordinances §§ 6-20-9 to 6-20-10 (2007). A "writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions . . . is acting illegally . . . ." Tenn. Code Ann. § 27-8-101.

**A. NON-CONFORMING USE**

Before addressing Petitioner's constitutional claims, the Court will first determine whether a valid adult entertainment usage of the facility predated the 1993 Ordinance prohibiting adult entertainment in the CBD, and if so, whether that preexisting and non-conforming adult use has been maintained since that time.

The lawful use of property existing prior to the passage of a zoning ordinance is typically referred to as a nonconforming use. Manhattan, Inc. v. Shelby County, No. W2006-02017-COA-R3-CV, 2008 Tenn. App. LEXIS 136 at *21 (Tenn. Ct. App. 2008) (citing Lafferty v. City of Winchester, 46 S.W.3d 752, 754 n.1 (Tenn. Ct. App. 2000)). Tennessee state law broadly protects the property interests of individuals whose valid use of their property is subsequently outlawed by changes to the applicable zoning ordinances. See Tenn. Code Ann. § 13-7-208(b)(1). Similarly, the City's zoning ordinance also offers protection for lawful, non-conforming uses that predate a particular zoning change. Memphis, Tenn., Ordinances § 16-116-2 (2007). These provisions are commonly referred to as "grandfather clauses." A grandfather clause exception is "construed strictly against the party who seeks to come within the exception." Coe v. City of Sevierville, 21 S.W.3d

237, 243 (Tenn. Ct. App. 2000). The party seeking protection of the grandfather clause has the burden of proving that the preexisting, non-conforming use qualifies for protection. Lamar Tenn., LLC v. City of Hendersonville, 171 S.W.3d 831, 836 (Tenn. Ct. App. 2005). Thus, Petitioner must demonstrate: "(1) a change in zoning restrictions, and (2) permissive operation of the business prior to the change." Id.

As to the first prong, Petitioner has met its burden of demonstrating a change in the applicable zoning restrictions. "[T]he zoning change must be significant 'insofar as plaintiff is concerned'; it require[s] a change in the uses allowed under the zoning code, which change affects the plaintiff's use of his land." Lamar Adver. v. City of Knoxville, 905 S.W.2d 175, 177 (Tenn. Ct. App. 1995) (quoting Rives v. City of Clarksville, 618 S.W.2d 502, 506 (Tenn. Ct. App. 1981)). The parties agree that the 1993 Ordinance removed adult entertainment as one of the permitted uses of the CBD. Therefore, the Court concludes that there was a significant change in zoning restrictions that affected Petitioner's intended use of the premises.

Turning to the second prong, Petitioner must demonstrate that before the zoning change, the prior establishments at 600 Marshall were lawfully providing adult entertainment. Petitioner may not use the prior illegal usages of previous owners or tenants to grandfather its intended non-conforming usage. "It is implicit in the law that the "grandfathering clause" of any statute, resolution or ordinance contemplates a lawful activity being conducted which becomes a non-conforming use after passage of a statute, resolution or ordinance." Coe, 21 S.W.3d at 243 (citing Chadwell v. Knox County, 980 S.W.2d 378, 381 (1998)). As previously observed by the Court, the mere fact that an area is zoned to permit adult entertainment does not mean that any establishment may simply offer such entertainment. 600 Marshall Entertainment Concepts, LLC, d/b/a The Spot

v. The City of Memphis, No. 05-2865 (W.D. Tenn. Dec. 30, 2005) (Order Denying Request for

Preliminary Injunction).  Rather, the legal provision of adult entertainment still requires applicable

permits and other City indicia of approval.  Id.

In this case, adult entertainment was permitted in the CBD prior to 1993, provided that the

establishment maintained a U & O from the Office of Code Enforcement and other required permits.

As to 600 Marshall's prior U & O designations, the venue was usually coded as a nightclub.  After

considering Medlock's testimony, the Court finds that earlier operators of 600 Marshall likely had

proper U & O's since the City has only recently begun to separately designate adult entertainment

nightclubs.  Hence, a facility prior to 1993 in the CBD could legally provide adult entertainment

with a nightclub or other similar U & O designation.

Nonetheless, there is limited evidence as to whether adult entertainment was ever permitted

at 600 Marshall.  Petitioner submitted the affidavits and testimony of several former patrons and

employees who testified that from the 1970's until the early 1990's, the location continuously and

regularly featured what they considered adult entertainment, including dancers who danced for

compensation.  Although several of the activities described by these individuals appear to fall within

the City's definition of adult entertainment, the Court finds that this testimony is insufficient,

standing alone, to establish that prior venues at 600 Marshall were lawfully providing adult

entertainment.

In order to legally provide adult entertainment, a facility is required to obtain the required

permits.  While the witnesses stated that they often observed compensated dancers at 600 Marshall,

the City's Permits and Licensing Department never issued a CDP for the location prior to the permit

initially issued to Westlund.[9]  Even assuming that the City was aware that compensated dance

occurred at 600 Marshall despite the lack of a CDP, the City's failure to enforce the applicable

permit law does not prevent the City from later enforcing the law.  See Rives v. Clarksville, 618

S.W.2d 502, 506 (Tenn. Ct. App. 1981).  In sum, Petitioner has failed to bring forth sufficient

evidence that 600 Marshall's proprietors were permitted to provide adult entertainment prior to

1993.  As a result, the Court cannot conclude that an earlier permitted use of the property became

a pre-existing, non-conforming use after the adoption of the 1993 Ordinance.

Moreover, even if the Court assumed that a valid adult entertainment usage survived the

enactment of the 1993 Ordinance, it is unclear whether such usage continued through the period

immediately prior to Westlund's purchase of 600 Marshall.  The City's zoning ordinance provides,

in relevant part:

> F. Abandonment or Discontinuance. When a nonconforming use of land or a
> nonconforming use of part or all of a structure is discontinued or abandoned for a
> period of three hundred sixty-five (365) consecutive days (regardless of any
> reservation of an intent not to abandon and to resume such use), such use shall not
> thereafter be reestablished or resumed. Any subsequent use or occupancy of such
> land or structure shall comply with the regulations of the zoning district in which
> such land or structure is located.

Memphis, Tenn., Ordinances § 16-116-2(F) (2007).  Accordingly, the ordinance provides for the

lapse of non-conforming uses that are not maintained for one year.

---

[9]Affiant Dennis Stephen Belski (Belski) stated that from the mid-1970's to the late-1990's, "the owner had a dance permit and other permits that allowed these activities."  (Ex. 12.) The Court affords this general assertion little weight because Petitioner offers no foundation for Belski's understanding of the applicable permit requirements.  The Court also discounts Affiant Michael Ray Lutt's statement that a prior club had a "cabaret dance license" based on the same reasoning.  (Ex. 14.)

In the present case, it appears that Rosengarten, the operator of 600 Marshall immediately prior to Petitioner, did not intend to provide adult entertainment[10] at the facility and voluntarily abandoned such use. His Applications for Public Dance Hall Permit and insurance applications never indicated that 600 Marshall would feature adult entertainment or dancers receiving compensation. Moreover, although Rosengarten's testimony is inconsistent as to the type of and timing of the supposed adult entertainment that occurred, it appears that many of these events were initiated by the patrons themselves and not the facility's operators. For example, Rosengarten did not set up the viewing of adult films or encourage those attending fetish parties to expose themselves. (Prelim. Inj. Hr'g Tr. 72-73, 84-85.) Rather, he and management simply did not prevent these events from happening. Furthermore, several of these events, including the male strippers, occurred before Rosengarten assumed operation of the venue. Although Rosengarten admitted at the preliminary injunction hearing that management did compensate a group of performers referred to as a "suspension team,"[11] it is unclear when this performance began or ceased. Notwithstanding, Rosengarten's testimony and his course of conduct indicate either: (1) he did not intend to provide adult entertainment, or (2) he intended to provide such entertainment unlawfully since he failed to disclose such an intent on his permit applications. 600 Marshall Entertainment Concepts, LLC, d/b/a The Spot v. The City of Memphis, No. 05-2865 (W.D. Tenn. Dec. 30, 2005)

---

[10]Rosengarten stated that initially, he understood adult entertainment to mean a topless bar, strip club, or pornographic bookstore. (Prelim. Inj. Hr'g Tr. 65, 80.) It appears he later became aware of the City ordinance's definition of the phrase. (See id. 79-80, 95.)

[11]This group featured individuals with various piercings who would perform an act that might include exposure of genitalia or the female breast. 600 Marshall Entertainment Concepts, LLC, d/b/a The Spot v. The City of Memphis, No. 05-2865 (W.D. Tenn. Dec. 30, 2005) (Order Denying Request for Preliminary Injunction); (Prelim. Inj. Hr'g Tr. 85, 90.)

(Order Denying Request for Preliminary Injunction).  Either conclusion is fatal to Petitioner's contention that a valid, non-conforming use continued up until the time it took over 600 Marshall. Id.

The testimony of Kamp and Tucker, patrons who frequented 600 Marshall during Rosengarten's tenure, also supports Rosengarten's assertions that he did not intend to provide adult entertainment.  These witnesses testified that there were wet T-shirt contests and women who would expose themselves or simulate sexual acts, among other things.  Based on Kamp's and Tucker's testimony, it is unclear whether the contests were sponsored by the facility or those who rented it. Further, it again appears that participants in the contests removed their clothing of their own accord and not at the behest of 600 Marshall's management.  Finally, Tucker testified that the venue's operators did not tolerate male patrons exposing themselves to female patrons.  This fact is also consistent with Rosengarten's testimony that he never intended to provide adult entertainment.

After considering the evidence as a whole, the Court cannot conclude that any remaining adult entertainment usage survived the 1993 Ordinance since such usage was abandoned by 600 Marshall's prior operators.  Because Petitioner has failed to establish that the preexisting, non-conforming use qualifies for protection under the City's grandfather clause, the Court denies Petitioner's request for relief as to this issue.

**B.      CONSTITUTIONAL CLAIMS**

Petitioner also contends in its pretrial memorandum that the City's alleged wrongful revocation of its CDP violates: (1) the First Amendment; (2) the Equal Protection Clause; and/or (3) the Due Process Clause.  The Court has disposed of Petitioner's claims based on non-constitutional grounds, i.e., zoning law.  Because 600 Marshall is not grandfathered, Petitioner has no right to

operate an adult entertainment facility at that location, regardless of the permitting scheme's alleged

constitutional violations.[12]  "Where a statutory or nonconstitutional basis exists for reaching a

decision, . . . it is not necessary to reach the constitutional issue."  Adams v. City of Battle Creek,

250 F.3d 980, 986 (6th Cir. 2001).  See also Teague v. Campbell County, 920 S.W.2d 219, 221

(Tenn. Ct. App. 1995) (citing Watts v. Memphis Transit Mgmt. Co., 462 S.W.2d 495 (Tenn. 1971))

("[I]t is our duty to pretermit a constitutional issue if the case can be disposed of on a non-

constitutional issue."); 16 Am. Jur. 2d Constitutional Law § 117 (2008) (discussing the doctrine of

strict necessity).  As a result, the Court declines to address the constitutional arguments presented

in this case.

## IV.    CONCLUSION

Based on the foregoing, the Court finds Petitioner is not entitled to any of the relief sought.

Judgment is entered for the City and this matter is **DISMISSED**.


        **IT IS SO ORDERED** this 23rd day of July, 2008.

                                        s/Bernice Bouie Donald
                                        BERNICE BOUIE DONALD
                                        UNITED STATES DISTRICT COURT JUDGE

---

[12]Petitioner is not challenging the constitutionality of the City's grandfathering laws.