**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **600 Marshall Entertainment Concepts, LLC, d/b/a The Spot,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **No. 05-cv-2865** |
| | ) | |
| **The City of Memphis, Permit Office of the City of Memphis** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **Memphis Medical Center, a Division of the Memphis Bio-Works Foundations** | ) | |
| | ) | |
| **Intervenor.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court on the request of Petitioner 600 Marshall Entertainment Concepts, LLC, d/b/a The Spot ("600 Marshall") for injunctive and declaratory relief. 600 Marshall asserts that the City of Memphis ("the City") wrongfully denied it a Compensated Dance Permit ("CDP") without a prohibition on adult entertainment because 600 Marshall is entitled to "grandfathering." After a nonjury trial on June 9-10, 2008, the Court found that 600 Marshall failed to carry its burden of showing, by a preponderance of the evidence, that it was entitled to grandfathering. 600 Marshall appealed, and on April 26, 2010, the United States Court of Appeals for the Sixth Circuit remanded the case for additional factual findings and legal conclusions. Specifically, the Sixth Circuit directed the trial court to address:

1) the history of adult entertainment at 600 Marshall; 2) whether such entertainment was abandoned or discontinued; 3) the possible expansion of any prior nonconforming use; and, 4) the availability of damages for alleged constitutional violations.

## I.    BACKGROUND

600 Marshall is a Tennessee limited liability company doing business at 598, 600, and 616 Marshall and 631 Madison in Memphis, Tennessee.  The 600 Marshall locations are within the zoning district known as the Central Business District ("CBD").  The CBD was created by ordinance in 1981.  From 1981 to 1993, "adult entertainment" was permitted in the CBD provided that the facility obtained and maintained certain permits.  See Memphis, Tenn., Code § 16-8-2 (defining "adult entertainment").  In 1993, the City of Memphis and Shelby County issued Joint Ordinance No. 4209 ("the 1993 Ordinance"), which prohibited adult entertainment within the CBD.

Since 1967, Memphis, Tenn., Code § 6-20-1 et seq. ("the Dance Hall Ordinance") has regulated "Dances and Dance Halls."  Pursuant to § 6-20-4, businesses desiring to feature dancing of any kind have been required to secure a Public Dance Hall Permit.[1]  Further, if these businesses wish to allow "any person to accept compensation directly or indirectly for dancing, [and] if alcoholic beverages, beer or wine are served in the same room where dancing occurs," such businesses are required to secure a Compensated Dance Permit ("CDP") pursuant to § 6-20-

---

[1] Memphis, Tenn., Code § 6-20-4 states:

> It is unlawful for any person or dance hall operator to hold or conduct any public dance, or to operate any public dance hall within the city, until such dance hall, or other place in which such public dance may be held, shall first have been duly registered as a public dance hall with, and approved by, the city treasurer, and a permit shall have been issued by the city treasurer, or his or her designee, for the operation of such public dance hall or the holding of such public dance.

The following section, Memphis, Tenn., Code § 6-20-5, specifies the information to be included in an Application for Public Dance Hall Permit.

11(C).   Numerous Public Dance Hall Permits have been issued for the businesses operating at the 600 Marshall locations, but there has not been a CDP issued for those properties since at least 1991.

On August 15, 2005, Charles G. Westlund ("Westlund") entered into an agreement to purchase the 600 Marshall properties with the intention of operating adult nightclubs with compensated, adult-entertainment dancing.  Prior to entering into the agreement, Westlund spoke with the manager of the City's Office of Permits and Licenses, Lilli Jackson ("Jackson"), who told him that he would be able to obtain the required permits.  Westlund also spoke with individuals who knew of the past activities at 600 Marshall, including previous owners, operators, and employees.  Satisfied that he would be able to open and operate an adult nightclub on the premises, Westlund closed on the property, began obtaining permits, and shortly thereafter began renovating the property.  Also on August 15, 2005, Westlund  applied for a CDP in the name of 600 Marshall through the Office of Permits and Licenses.  On the application for a Public Dance Hall Permit, 600 Marshall stated that it would feature adult entertainment and that its dancers would receive compensation.[2]  600 Marshall was issued a CDP on September 16, 2005, with a restriction as to nudity.[3]

Just ten days later, on September 26, Jackson informed 600 Marshall by letter that her office may have acted in error when it issued the CDP and that the matter was under

---

[2] Copies of the Application for Public Dance Hall Permit were admitted into evidence.  Question seven of the Application for Public Dance Hall Permit asks whether the facility will feature adult entertainment and, if so, to describe completely the type of entertainment that will be provided. Question eight asks whether any person at the establishment will accept compensation directly or indirectly for dancing and provides the option of checking "yes" or "no."

[3] "Nudity" is defined as "the showing of the bare human male or female genitals or pubic area with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of the areola, or the showing of the covered male genitals in a discernibly turgid state."  Tenn. Code Ann. § 39-13-511 (2)(A).  A person who appears in a state of nudity in a "public place"—which includes nightclubs, cabarets, and similar businesses, whether open to the public at large or where entrance is limited by a cover charge or membership requirement—commits the offense of public indecency. Tenn. Code Ann. § 39-13-511 (2)(B)(i); (a)(1)(A).

administrative review. On October 4, 2005, Jackson, after consulting with the City's attorneys and zoning officials, informed 600 Marshall by letter[4] that her office was revoking the CDP because the 600 Marshall properties were located in the Central Business Improvement District ("CBID"),[5] within which adult entertainment was not permitted. See Memphis, Tenn., Code § 6-20-10.[6]

As a result of the revocation of the CDP, Westlund believed that he could not operate an adult entertainment nightclub or even a non-adult entertainment nightclub with clothed, compensated dancers. 600 Marshall therefore pursued administrative review of the revocation of the CDP. On November 2, 2005, a three-member panel designated by Larry Godwin

---

[4] The letter states, in pertinent part:

> [I]t has been confirmed that your establishment is located within the [CBID] and, therefore, the site was and is ineligible for a [CDP].
>     This [sic] [CBID] is intended to permit a mixture of uses and activities that will complement the sports and entertainment facilities that are located in this area. For this reason, the Memphis and Shelby County Zoning Ordinance sets forth the types of entities that are permitted within the CBID boundaries. . . . It further lists the entities that are permitted within the CBID area. Section 35(1)(D) specifically provides that "Adult entertainment shall not be permitted" within the CBID boundaries.
> . . .
> Inasmuch as the issuance of the permit was in error, the Permit Department must rescind its issuance of the [CDP] to your establishment. . . .

[5] The CBID is a tax overlay district that coincides with the CBD zoning district. See Memphis, Tenn., Code § 12-32.

[6] Memphis, Tenn., Code § 6-20-10 governs the revocation of a CDP and administrative review of that revocation:

> If a public dance hall permit has been issued under the provisions of this chapter, and such public dance hall is being conducted in violation of the laws of this state or of this chapter, or of any other law or ordinance relating to the operation of public dance halls, the director of police services may at any time give notice in writing to the holder of the permit or other person in control of the operation and maintenance of such public dance hall that the permit has been revoked and cancelled. Such written notice shall state the reason for such revocation and cancellation and shall become a final revocation and cancellation after the expiration of ten (10) days from the date of services of such notice, unless on or before the expiration of such ten (10) days the permit holder or other person in control of the operation and maintenance of the public dance hall shall file with the director of police services a written request for a hearing before him or her upon the question whether or not the permit should have been revoked and cancelled. Such hearing shall be held by the director or his or her designated representative within thirty (30) days after the date of filing of such request therefore, and the action and judgment of the director of police services, after hearing all the evidence and facts, shall be final and subject to court reviews [sic] as provided by law.

4

("Godwin"), the director of Police Services, heard 600 Marshall's appeal.  The panel found that the permit was "wrongfully revoked and that the permit should be reissued immediately conditioned on prohibition of any adult entertainment or activity . . . unless and until 600 Marshall receive[d] the proper approvals from the Building Official."  Dedrick Brittenum, a member of the panel, testified at trial that the panel's decision was based on its understanding that the issuance of a CDP was unrelated to the presence of adult entertainment.

Though Godwin was not present during the panel hearing and was admittedly unfamiliar with the CDP policies and procedures, he nonetheless rejected the panel's recommendation on December 15, 2005.  He explained at trial that he understood the panel's purpose to be determining whether the permit was initially issued in error and that he did not believe the panel could recommend re-issuance of the permit.  Stated differently, Godwin believed that the panel acted beyond its legal authority.  It was this sequence of events which prompted the instant litigation.

## II.    ISSUES ON REMAND

The Sixth Circuit remanded this case with a directive that the Court address the following issues:

1.  Whether there were adult entertainment activities at the 600 Marshall locations prior to 1993 that did not require a CDP sufficient to substantiate grandfathering;

2.  Whether prior owners of 600 Marshall abandoned or discontinued adult entertainment under Memphis, Tenn., Code § 16-116-2(F) or affected a change in use under Memphis, Tenn., Code § 16-116-2(E).

3.  Whether allowing adult entertainment that does require a CDP would violate Memphis, Tenn., Code § 16-116-2(C), which prohibits the expansion of a nonconforming use "in

5

such a manner as . . . to further conflict with . . . any use limitation established for the district in which such use is located."

4. Whether 600 Marshall is entitled to recover damages under 42 U.S.C. § 1983 as a result of the City's revocation of its CDP.

### III.    ANALYSIS

#### 1. Whether there were adult entertainment activities at 600 Marshall prior to 1993 that did not require a CDP sufficient to substantiate grandfathering.

600 Marshall has the burden of proving "a pre-existing non-conforming use qualifying for protection." Lamar Tennessee, LLC v. City of Hendersonville, 171 S.W.3d 831, 836 (Tenn. Ct. App. 2005). To meet this burden, it must show "(1) a change in zoning restrictions, and (2) permissive operation of the business prior to the change." Id. The parties agree that the 1993 Ordinance changed the zoning restrictions by eliminating adult entertainment as a permitted use. To satisfy the second prong, 600 Marshall must show that the businesses operating at its location provided lawful adult entertainment that became non-conforming with the enactment of the 1993 Ordinance. See Coe v. City of Sevierville, 21 S.W.3d 237, 243 (Tenn. Ct. App. 2000) (explaining that grandfather clauses implicitly contemplate a lawful activity which becomes non-conforming after the passage of legislation).

The Court previously found that 600 Marshall had not satisfied the second prong because, even if prior owners of the subject properties provided adult entertainment prior to 1993, they had done so unlawfully because they had not been issued CDPs. The Sixth Circuit observed, however, that the absence of CDPs is not dispositive because it fails to account for adult entertainment of a variety that does not involve compensated dancing. The Court must therefore determine, on remand, whether there were adult entertainment activities at the 600 Marshall locations prior to 1993 that did not require a CDP sufficient to substantiate grandfathering.

600 Marshall presented affidavits and testimony of several former patrons and employees who described the activities at the 600 Marshall locations between the 1970s and the late 1990s.[7] Several of the activities described fall within the City's definition of "adult entertainment" but would not require a CDP.[8]  For example, Grace Irene Perry, a patron, testified that she regularly observed drag shows and adult films from 1977 to 1986 and that these activities involved the exposure of breasts, buttocks, and male genitalia.  Likewise, Albert Wayne Rhea ("Rhea"), a patron, stated that since well before 1982 he regularly witnessed drag shows and simulated sex-

---

[7] In its memorandum opinion, the Court stated that it was unable to locate the exhibits to the preliminary injunction hearing, which were also admitted by consent at trial.  The Court has since located the exhibits.

[8] Pursuant to Memphis, Tenn., Code § 16-8-2, "'adult entertainment' means and includes any and all of the following":

   a.  "Adult book/video store" means an establishment having as a substantial or significant portion of its stock in trade, books, magazines, videos, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas," as these terms are later defined in this section, or an establishment with a segment or section devoted to the sale or display of such material.

   b.  "Adult motion picture theater" means an enclosed building with a capacity of fifty (50) or more persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas," as these terms are later defined in this section, for observation by patrons therein.

   c.  "Adult mini-motion-picture theater" means an enclosed building with a capacity for less than fifty (50) used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas," as these terms are later defined in this section, for observation by patrons therein.

   d.  "Live performance" means an establishment where "specified sexual activities" or "specified anatomical areas," as these terms are later defined in this section, are performed live or displayed for actual observation by patrons therein.

   e.  "Adult novelty store" means an establishment having at least five percent of its retail sales area devoted to adult goods which are distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas," as these terms are later defined in this section.

The term "specified sexual activities" is later defined as:

   a.  Human genitals in a state of sexual stimulation or arousal;

   b.  Acts of human masturbation, sexual intercourse or sodomy;

   c.  Fondling or other erotic touching of human genitals, pubic region, buttock or female breast;

   d.  Acts of bestiality

The term "specified anatomical areas" is later defined as:

   a.  Less than completely and opaquely covered:
      (1) Human genitals, pubic region,
      (2) Buttock, and
      (3) Female breast below a point immediately above the top of the areola; and

   b.  Human male genitals in a discernible turgid state, even if completely and opaquely covered.

act shows that involved the touching of buttocks and other body parts.  Lisa Louise McNeil, an employee in 1986 and a patron prior to that time, stated that she often observed drag shows and simulated sex-act shows.  Finally, Michael Ray Lutts ("Lutts"), a former employee and patron, stated that from the late 1970s through 1986, activities at the club included adult films in booths, male strippers who often danced with erections, topless female patrons, and drag shows.  These are activities which clearly come within the ambit of "adult entertainment" as defined in the City's ordinance.

In response, the City argues that there is no proof of adult entertainment between 1986 and 1993, the year the zoning change became effective.  However, 600 Marshall did present the affidavit of Stephen Belski ("Belski"), who worked at the club located at 600 and 616 Marshall "from the mid to late seventies to the late 1990's" and was also a patron during that time.  Belski stated that, during that time, he observed adult movies and drag performers "all the time."  While the Court recognizes that an uncorroborated statement contained in an affidavit is scant proof on a critical question, the City has offered no evidence which directly controverts it.  Therefore, for the purposes of resolving Issue 1, the Court finds that Belski's affidavit supports a finding that there was adult entertainment at 600 Marshall prior to 1993 that did not require a CDP.  While this finding is sufficient to substantiate grandfathering, the Court emphasizes that such grandfathering extends only to those nonconforming activities that were being lawfully presented at the time the change in zoning took effect.

### 2. Whether prior owners of 600 Marshall abandoned or discontinued adult entertainment under Memphis, Tenn., Code § 16-116-2(F) or affected a change in use under Memphis, Tenn., Code § 16-116-2(E).

Pursuant to Memphis, Tenn., Code § 16-116-2(F), a venue engaging in a nonconforming use loses the right to such use if it abandons or discontinues the nonconforming use for a period

of 365 days. The Court must therefore determine whether 600 Marshall met its burden of demonstrating that the businesses operating at its location featured adult entertainment at least once every 365 days between 1993 and August 2005 when Westlund purchased the properties.

Again, Belski stated in his affidavit that he observed drag shows and adult movies on the properties "all the time" into the "late 1990's." He stated, moreover, that male strippers danced for compensation during that time at least four to five times a week. 600 Marshall also presented witness Nathan Rosengarten ("Rosengarten"), who began working at the locations in 1993 or 1994 and began running the facilities in 1996 or 1997. As a preliminary matter, the Court recognizes that Rosengarten's testimony by way of affidavit and during the preliminary injunction hearing is inconsistent with his testimony at trial. He first stated that through July 2005 entertainment at the locations occasionally included adult films, fetish parties, gothic parties, male strippers, and musical acts; that both patrons and performers sometimes exposed their genitalia and breasts; that the performances did not always involve dance; and that often times the performers were not compensated. At trial, however, Rosengarten testified that there were gothic parties at regular intervals but that he ended them in March or April 2005 because they became too "crazy." Further, he testified that there were never strippers or adult films at the locations, and that the last fetish party occurred before he took over.

Despite these inconsistencies, Rosengarten's former testimony is corroborated by the trial testimony of witnesses Jason Kamp ("Kamp") and Bryant Tucker ("Tucker"), both of whom visited the locations periodically in the late 1990s and early 2000s. Kamp visited approximately three to four times per year between 1998 and 2005, and Tucker visited approximately every other Thursday from 2002 to 2003. They testified that there were wet t-shirt contests that often resulted in women removing their shirts, men exposing their penises, women exposing their

breasts, buttocks, and vaginas, and women simulating or engaging in sex acts such as masturbation.  Both Kamp and Tucker also observed individuals exposing themselves in the "dungeon," the basement where the gothic parties were held.  Some of these activities apparently were promoted by management because the venue distributed flyers advertising adult entertainment and employed a disc jockey to preside over the wet t-shirt contests.

Based on this evidence, the Court cannot conclude that prior owners of 600 Marshall abandoned or discontinued adult entertainment under Memphis, Tenn., Code § 16-116-2(F).  Rather, the weight of the evidence supports the conclusion that the businesses operating at the subject properties provided adult entertainment at least once a year and usually more throughout the 1990s and into the spring of 2005.  The City argues, nonetheless, that prior owners of 600 Marshall forfeited the right to provide adult entertainment by affecting a change to a conforming use under Memphis, Tenn., Code § 16-116-2(E), which states, in relevant part:

> When such nonconforming use has been changed to a permitted use, it shall only be used thereafter for a use permitted in the zoning district in which it is located.  For purposes of this subsection, a use shall be deemed to have been so changed when an existing nonconforming use shall have been terminated and the permitted use shall have been commenced and continued for a period of seven days.

While there is evidence, as the City points out, of conforming activities at the locations such as bands like Blues Traveler, there is no evidence that they continued for a period of seven days uninterrupted by adult entertainment.  Moreover, even the bands that performed sometimes provided adult entertainment.  For example, Rosengarten testified that musician Marilyn Manson as well as a music group called the Impotent Sea Snakes exposed themselves on stage.  Finally, while Rosengaraten testified that the last gothic party took place in March or April 2005, no evidence was presented regarding the type of entertainment, if any, featured between that time and the time Westlund acquired the property, approximately four to five months later.

Consequently, there is no basis on which the Court could conclude that Rosengarten affected a change to a conforming use under § 16-116-2(E) during the relevant time period.

      **3.  Whether allowing adult entertainment that does require a CDP would violate Memphis, Tenn., Code § 16-116-2(C), which prohibits the expansion of a nonconforming use "in such a manner as . . . to further conflict with . . . any use limitation established for the district in which such use is located."**

Memphis, Tenn., Code § 16-116-2(C) provides that "[a] nonconforming use shall not be extended, expanded, enlarged or increased in intensity."  Among other things, the activities expressly prohibited by this section include the "[o]peration of such nonconforming use in such a manner as to . . . further conflict with . . . any use limitations established for the district."  Id. The only defined use limitation established for the CBID at issue is the 1993 Ordinance prohibiting "adult entertainment," which includes the five subcategories set out in Memphis, Tenn., Code § 16-8-2.  Adult entertainment that requires a CDP—i.e., adult entertainment dance performed by compensated dancers where alcohol is sold—falls within subcategory four, "Live performance."  As evinced by the affidavits and testimony of the individuals who frequented the 600 Marshall locations, various forms of adult entertainment within the "live performance" subcategory—drag shows, wet t-shirt contests, gothic parties, and simulated sex-act shows—did in fact take place at various times throughout the properties' history.  Thus, under Memphis, Tenn., Code § 16-116-2(A), these "lawfully existing nonconforming use[s] . . . may be continued."

However, this same evidence also establishes that past activities at 600 Marshall did not include the lawful presentation of live adult entertainment performed by compensated dancers during the relevant time period.  This fact was established by the testimony of Mr. Vincent Higgins, the Permits Administrator for the City of Memphis.  Mr. Higgins reviewed the files of all dance permit applications for the 600 Marshall locations dating back to 1991.  Since that time,

there has never been a CDP issued to any of the 600 Marshall properties.  While 600 Marshall argues correctly that "there can be lawful adult entertainment without the requirement for a permit of any type," this argument fails to acknowledge that only that entertainment which was being lawfully presented at 600 Marshall at the time of the 1993 Ordinance is entitled to continue.  600 Marshall has failed to establish that the type of entertainment that would require a CDP—adult entertainment by compensated dancers—was being lawfully presented on the premises at that time.  Further, the mere fact that such entertainment falls into the same subcategory ("live performance") as the prior activities does not lead directly to the conclusion that such entertainment would not impermissibly expand the prior nonconforming use at 600 Marshall.  Before coming to any such conclusion, a more reasoned approach requires that the Court compare the nature and extent of the prior nonconforming use at the relevant time with 600 Marshall's desired use of the property going forward to determine if it would effect an expansion.

The Court received evidence of the past activities at the 600 Marshall locations in the form of live testimony and affidavits of former employees and patrons.  With one exception addressed below, the affidavits describe the activities which took place at 600 Marshall during the timeframe from the 1970s to 1986.  The affiants gave remarkably similar statements, each recounting male dancers dancing with erections, women dancing erotically, films in the basement, drag shows, and shows with people simulating sex acts with fondling and touching of buttocks and other body parts.  Each affiant asserted that "the use was continuous and was not terminated" through 1986 and that "the dancers danced for compensation."  Even if the Court accepts these statements as true, they do not provide evidence of the activities at 600 Marshall during the critical time period—specifically, the time immediately preceding the adoption of the

1993 Ordinance.  Thus, these affidavits do not assist the Court in resolving the third issue on remand.

As discussed in the analysis of Issue 2, the affidavit of Stephen Belski purports to describe the activities at 600 Marshall "from the mid to late seventies to the late 1990s." According to Belski, during that time he observed dancers performing for compensation at least four times a week.  This testimony, if true, also fails to advance 600 Marshall's argument because it is uncontroverted that no CDPs were issued to 600 Marshall since at least 1991.  Thus, if in fact Mr. Belski observed dancers performing for compensation at 600 Marshall on a regular basis between 1991 and 1993, such entertainment was not being presented "lawfully."  The Court reiterates that only "*lawfully existing* nonconforming use[s] . . . may be continued." Memphis, Tenn., Code § 16-116-2(A) (emphasis added).

The trial testimony of witnesses was similarly deficient in that it failed to account for the activities at 600 Marshall immediately preceding the adoption of the 1993 Ordinance.  Nathan Rosengarten's testimony comes the closest to encompassing the relevant timeframe—although, as previously noted, he gave conflicting testimony about when his involvement with 600 Marshall began.  Putting aside the discrepancies in his testimony, Rosengarten indicated that "[s]ince the time I have been associated with the club, the club has *on occasion* had adult films in booths, fetish parties, gothic parties, male strippers and other performers who would expose genitalia, breasts and do other things as part of their act which I would consider as adult entertainment.  These events occurred *at least every two to three months*.  Often women who frequented the club for the fetish or gothic nights would go topless.  This use continued and did not terminate while I was with the location until July 2005."  (Rosengarten Affidavit, Ex. 13.)

(emphasis added).[9]

At best, the evidence presented indicates that the nonconforming activities at 600 Marshall at the time of the 1993 Ordinance consisted of sporadic incidents of "live performance" adult entertainment. This entertainment was either of a nature that did not require a CDP or was being presented unlawfully without the requisite permit. At worst, the evidence fails to account at all for the activities at 600 Marshall from 1991 to 1993, the timeframe immediately preceding adoption of the Ordinance. In either case, Mr. Westlund indicated in his 2005 CDP application his intention to begin presenting on a regular basis adult entertainment by compensated dancers. There is no question that this type of adult entertainment was not being lawfully presented at the time of the 1993 Ordinance and is thus beyond the scope of any prior nonconforming use. It is equally clear that the nightly presentation of such entertainment would "extend[], expand[], enlarge[], or increase[] in intensity" 600 Marshall's prior nonconforming activities, which were infrequent and interspersed with regular, mainstream musical and social events. Such an expansion would be in direct contravention of Memphis, Tenn., Code § 16-116-2(C).

Finally, the Court addresses briefly 600 Marshall's contention that the City lacks the legal authority to prohibit the expansion of its nonconforming use. (See Petitioners' Br. at 15.) In support of this assertion, 600 Marshall points to language in Lafferty v. City of Winchester, 46 S.W.3d 752, 758 (Tenn. Ct. App. 2001) to the effect that owners of nonconforming use properties "may expand . . . or even reconstruct their business premises." Specifically, Lafferty relies on a particular section of the Tennessee code which provides that such businesses "shall be allowed to expand operations . . . which involve an actual continuance and expansion of the

---

[9] The Court will not recount the trial testimony of other witnesses, as such testimony did not encompass the time immediately preceding the adoption of the 1993 Ordinance and thus does not assist in the analysis of Issue 3. The testimony of Jason Kamp and Bryant Tucker spans the timeframe of 1998 through 2005. Witness Grace Perry testified to activities at 600 Marshall between 1977 and 1986.

activities of the . . . business which were permitted *and being conducted* prior to the change in zoning." Id. (citing Tenn. Code Ann. § 13-7-208(c)) (emphasis added).  As set forth above, live adult entertainment by compensated dancers is not the type of business activity that was being lawfully conducted at 600 Marshall prior to the 1993 Ordinance.  Thus, this code section does not preclude the City from enforcing its ordinance and prohibiting 600 Marshall's proposed expansion of adult entertainment activities to include compensated adult dance.

### 4.   Whether 600 Marshall is entitled to recover damages under 42 U.S.C. § 1983 as a result of the revocation of the CDP.

As instructed by the Sixth Circuit, the Court must also address 600 Marshall's claim for damages under 42 U.S.C. § 1983.  A party who asserts a claim for relief under § 1983 must satisfy two elements.  First, "the plaintiff must allege that some person has deprived him of a federal right," and second, "he must allege that the person who has deprived him of that right acted under color of state or territorial law."  See Martin A. Schwartz, Section 1983 Litigation Claims and Defenses § 1.04[A] (4th ed. 2009 Supp.) (hereinafter "Schwartz").  A plaintiff seeking to hold a municipality—e.g., a city or local government or one of its departments—liable for damages under §1983 must also establish that the violation of plaintiff's federal right is attributable to a policy, practice, or custom of the municipality.  Id.  A city will not be held liable solely for the misconduct of one of its employees on a theory of *respondeat superior*.  Doe v. Claiborne Cnty., Tenn. Bd. Of Educ., 103 F.3d 495, 507 (6th Cir. 1996); see also Pembauer v. City of Cincinnati, 475 U.S. 469, 479-80 (1986).  Rather, a plaintiff must show that the city itself is the wrongdoer, and that an officially executed policy or custom directly caused the alleged constitutional deprivation.  Doe v. Claiborne Cnty., Tenn. Bd. of Educ., 103 F.3d at 507.  The Court will examine each of these elements to determine whether 600 Marshall has proved a right to recover damages against the City under § 1983.

### a. Constitutional Deprivation

Turning to the first element of the prima facie case, 600 Marshall must establish that it was deprived of a right secured by the Constitution or federal statute. Throughout the course of this litigation, 600 Marshall has alleged in a very general way violations of its constitutional rights, but has failed in most instances to clearly and succinctly articulate the basis of its constitutional claims. At this stage, only one constitutional claim—a vagueness challenge—has been fully briefed and advanced by 600 Marshall. However, the pleadings also make repeated, albeit fleeting, references to "a protected property interest" and "arbitrary and capricious decision-making." Though 600 Marshall failed to fully develop its legal arguments on these latter issues, such references are sufficient to warrant discussion of a potential due process violation.

### i. Vagueness

Turning first to the issue of vagueness, Petitioners' Brief on Remand Issues asserts that "the Dance Hall Ordinance was unconstitutional as applied." (See Pet. Brief at 17.) In laying out the legal framework it deems relevant to the resolution of this claim, however, 600 Marshall appears to argue that the ordinance is unconstitutionally vague on its face. (Id.) ("It is axiomatic that the government has no right to enforce laws declared to be unconstitutional."). 600 Marshall directs the Court to begin the analysis of its vagueness claim with the Tennessee Supreme Court's decision in City of Knoxville v. Entertainment Resources, LLC, 166 S.W.3d 650 (Tenn. 2005). According to 600 Marshall, this case stands for the proposition that "the invalidity of a vague law [is] that [it] delegates the resolution of such administrative decisions to municipal officials 'on an ad hoc and subjective basis.'" (Pet. Br. At 17) (citing Entertainment Resources,

16

166 S.W.3d at 655).  600 Marshall goes on to quote additional language from Entertainment Resources:

> The ordinance gives no objective guidance to businesses regulated by the ordinance or officials charged with its enforcement.  Accordingly, it neither gives notice to ordinary people . . . nor sufficient guidance to law enforcement officials to prevent arbitrary law enforcement.  This type of vague, standardless drafting is precisely what the Due Process clause prohibits, because it allows policemen, prosecutors, and juries to pursue their personal predilections.  Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law.

(Pet. Br. at 18) (quoting Entertainment Resources, 166 S.W.3d at 656-67) (internal cites and quotation marks omitted).

Despite 600 Marshall's repeated assertions that the Dance Hall Ordinance is unconstitutionally vague "as applied," all of the legal authority it cites involves challenges to specific statutory language on the basis that it is unconstitutionally vague on its face.  600 Marshall does not explain, nor does it cite any authority that explains, how a law can be "vague as applied."[10]  It is true that vague laws are applied in ways that are unpredictable, subjective, and perhaps even discriminatory.  Indeed, this is the very danger that the vagueness doctrine seeks to dispel.  But a proper challenge on vagueness grounds is not a challenge to the way a law was applied in a particular instance; it is a challenge to the law itself.  Thus, the Court will treat 600 Marshall's vagueness claim as a challenge to the facial validity of the Dance Hall Ordinance.

The Supreme Court has observed that "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  The standard used to determine whether a law is vague is whether "men of common intelligence must necessarily guess at its meaning."  Broadrick v. Oklahoma, 413 U.S. 601, 607 (1973).   One dangerous effect of such vagueness is that it

---

[10] The Court notes that the plain meaning of the word also fails to shed light on 600 Marshall's "vague as applied" argument.  Merriam-Webster defines "vague" as "not clearly expressed: stated in general or indefinite terms; not having an exact or precise meaning."  Webster's Third New International Dictionary 2528 (1993).

"impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972). To avoid these dangers, the vagueness doctrine requires that, in addition to notice, statutes provide "minimal guidelines to govern law enforcement." Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 531 (Tenn. 1993). In fact, the United States Supreme Court has intimated that the requirement of minimal guidelines is the more important aspect of the vagueness doctrine. City of Knoxville v. Entm't Resources, L.L.C., 166 S.W.3d 650, 655 (Tenn. 2005) (citing Smith v. Goguen, 415 U.S. 566, 574 (1974)).

In support of its vagueness argument, 600 Marshall points to the fact that Jackson, the City's own Permits and Licensing manager, made assumptions about the requirements for issuance of a CDP, could not define the terms in the Application for a Public Dance Hall Permit, and wrongly assured Westlund that 600 Marshall would be granted the applicable permits. It was also Jackson's understanding that a CDP was to be issued for a "strip club" or other similar facility. This is in direct conflict with the administrative determination of Brittenum and the panel, which based its decision on its understanding that the issuance of a CDP was unrelated to the presence of adult entertainment. 600 Marshall also points out that Godwin rejected the panel's recommendation without reviewing a transcript of the hearing or articulating any sort of explanation, even though he was admittedly unfamiliar with the CDP protocol or criteria.

While the Court finds these facts troubling, 600 Marshall has not established that they are the result of any vagueness inherent in the Dance Hall Ordinance. Indeed, Jackson's "assumptions" and "understandings" about the requirements for a CDP apparently were made without any reference whatsoever to the language of the Dance Hall Ordinance. Likewise,

18

Jackson's inability to define the terms on the *permit application* does not speak to any constitutional deficiency or lack of clarity in the *statutory language*. Finally, 600 Marshall has failed to establish any connection between the "understandings" of Brittenum and the review panel and the language of the Dance Hall Ordinance. Based on the facts upon which 600 Marshall relies, and the failure to connect these facts to any statutory language which could be construed as vague, there is simply no basis on which the Court can find that the Dance Hall Ordinance is unconstitutionally vague, either on its face or "as applied."

### ii. Due Process

600 Marshall's other ostensible claim falls within the ambit of due process. Specifically, the Petition alleges that "once issued, the [CDP] became a property right of the Petitioner investing him with all the rights and privileges that the [CDP] allowed. The procedure of revocation and [only] thereafter providing Petitioner an appeal hearing violates the Petitioner's rights by taking a property right without due process of law." (Pet. at ¶ 29.) Later, in their Brief on Remand Issues, 600 Marshall alleges that Godwin's actions constitute a violation of substantive due process, which "occurs when arbitrary and capricious government action deprives an individual of a constitutionally protected property interest." (Pet. Br. at p. 21.)

The Court is satisfied that Godwin's actions constitute arbitrary and capricious decision-making. The administrative review panel that Godwin appointed carefully reviewed the facts, the law, and the arguments raised by both sides with respect to the revocation of 600 Marshall's CDP. As a result of this review, the panel correctly concluded that the right of 600 Marshall to be issued a CDP was separate and apart from the question of whether it was entitled to present adult entertainment. Based on that conclusion, the panel recommended that a CDP be re-issued to 600 Marshall conditioned on the prohibition of any adult entertainment or activity. The

19

prohibition could ultimately be lifted if and when 600 Marshall got proper approval to present compensated adult-entertainment dance.  Upon hearing the panel's recommendation, Godwin summarily rejected it and refused to re-issue the CDP.  Godwin made his decision without reviewing a transcript of the administrative proceedings, without conferring with the panel as to the basis of its decision, without articulating a factual basis for his action, and without any stated legal authority.  Moreover, Godwin testified at trial that he was unfamiliar with the requirements for obtaining a CDP or the legislation which governs the issuance of a CDP.  In fact, Godwin was only familiar with that portion of the ordinance that gave him the authority to reject the panel's recommendation.  Given his admitted lack of awareness of the evidence, the facts, and the law relevant to this issue, Godwin's actions are the essence of "arbitrary" and "capricious."

The Court is not satisfied, however, that 600 Marshall suffered a constitutional injury as a result of Godwin's conduct.  As 600 Marshall's Brief points out, only when such conduct "deprives an individual of a *constitutionally protected property interest*" has a violation of substantive due process occurred.  (Pet. Br. at p. 21) (citing Warren v. City of Athens, Ohio, 411 F.3d 697 (6th Cir. 2005) (emphasis added)).  To establish such an interest, "a person clearly must have more than an abstract need or desire for [some benefit].  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  The Sixth Circuit quoted this language in determining the rights of a pool room operator in Sanderson v. Village of Greenhills.  726 F.2d 284 (6th Cir. 1984).  In Sanderson, the plaintiff challenged the city council's apparently arbitrary refusal to grant him a license to operate a billiard hall.[11]  Id. at 285.  At the preliminary injunction hearing, the district judge determined that the plaintiff had not shown any

---

[11] It was later determined that the plaintiff in Sanderson did not in fact need the license to operate his business, but because he was forced to shut down while this determination was made, he brought an action for damages against the city under § 1983.

constitutional deprivation "inasmuch as there is no right, simply because one owns property, to obtain a license for use of that property in a particular way, and there is no federal right to be free from merely erroneous enforcement of local ordinances." Id.  On appeal, the Sixth Circuit agreed that the plaintiff's mere "expectation" that he would receive a license was insufficient to establish a protected property interest.   Id. at 286.   Having determined that the plaintiff in Sanderson was not entitled to a license, the Sixth Circuit held that "he suffered no constitutional injury upon its deprivation."  Id.

Like the plaintiff in Sanderson, 600 Marshall has not proven by a preponderance of the evidence that it had a legitimate claim of entitlement in the CDP.  Jackson's assurances to Westlund that he would receive the necessary permits cannot be said to create anything more than a "mere expectation."  The same can be said of Westlund's conversations with the previous owners, operators, and employees of 600 Marshall regarding the past activities on the premises. While it's true that 600 Marshall was initially issued a CDP which would allow it to present adult entertainment, it is equally clear—as determined by the review panel—that this permit was issued in error.  Thus, 600 Marshall's position is not analogous to "that of the welfare recipient who is cut off from the rolls" or "the driver confronting cancellation of his license" in that 600 Marshall cannot be said to have a *legitimate* claim of entitlement in a permit that was issued erroneously.  See id.  In sum, it is simply not enough that 600 Marshall allege a protected property interest; it is a crucial element of its claim on which it bears the burden of proof.   600 Marshall has offered no legal or factual support for its allegation that the erroneously-issued CDP became a property right entitled to constitutional protection.  Because it has failed to establish a protected property interest, 600 Marshall has also failed to prove a constitutional deprivation.  Thus, there is no foundation upon which the Court could find that 600 Marshall is

entitled to damages.

### b. Municipal Liability

Putting aside for a moment 600 Marshall's failure to establish a constitutional deprivation, the Court would have to address a whole host of municipal liability issues before it could impose liability on the City for Godwin's actions. Municipalities are not liable under § 1983 for every misdeed of their agents and employees. Garner v. Memphis Police Dept., 8 F.3d 358, 363 (6th Cir. 1993). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. (quoting Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978)). In line with this reasoning, the Sixth Circuit requires a plaintiff seeking to impose municipal liability to "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." Id. at 364 (quoting Coogan v. City of Wixom, 820 F.2d 170, 176 (6th Cir. 1987)). Such issues are far beyond the scope of the parties' pleadings, the evidence put on at trial, or the legal arguments advanced by either side. For instance, nowhere has 600 Marshall alleged that the injury it claims to have suffered is attributable to a municipal policy or custom. Nor has 600 Marshall alleged that Godwin establishes City policy with respect to the CDP licensing scheme such that his actions in this singular instance could subject the City to liability.[12] In fact, 600 Marshall has not articulated any explicit argument as to why the City should be liable for damages as a result of Godwin's conduct. Presumably, 600 Marshall believes it is enough that the City is Godwin's employer, but

---

[12] Moreover, the evidence in the record suggests a contrary conclusion: that it was the local legislative body which enacted the scheme governing issuance of dance permits, and thus it is this body which sets municipal policy with respect to such permits. Godwin is merely a designated decision-maker—not a *policymaker*—charged with executing policies not of his own making.

the law on this point is well-settled and to the contrary: "vicarious liability [is] incompatible with the causation requirement set out on the face of § 1983." City of St. Louis v. Praprotnik, 485 U.S. 112, 122 (1988). Rather, the Supreme Court has expressly articulated that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives *by the official or officials responsible for establishing final policy* with respect to the subject matter in question." 475 U.S. 469, 483 (1986). As 600 Marshall has offered no evidence or argument whatsoever on the issue of municipal liability, there is simply no basis on which the Court could find the City liable for damages as a result of Godwin's conduct.

**IV. CONCLUSION**

Based on the foregoing, the Court finds that adult entertainment which did not require a CDP was presented at 600 Marshall prior to the 1993 Ordinance, and this finding is sufficient to substantiate grandfathering. Moreover, sporadic incidents of adult entertainment continued until the time Westlund purchased the property, precluding a finding that the nonconforming use was abandoned or discontinued. However, permitting 600 Marshall to regularly feature adult entertainment by compensated dancers would impermissibly expand this prior nonconforming use in violation of Memphis, Tenn., Code § 16-116-2(C). The City therefore cannot be compelled to issue 600 Marshall a CDP that would allow adult-entertainment performed by compensated dancers. Finally, 600 Marshall has failed to prove a right to recover damages against the City under § 1983. For these reasons, the Court enters judgment for 600 Marshall on Issues 1 and 2, and for the City on Issues 3 and 4.

**IT IS SO ORDERED** this 21st day of September, 2011.


**s/ Bernice B. Donald**
**BERNICE B. DONALD**
**UNITED STATES DISTRICT JUDGE**